Case number 13-7159, William Boykin, homeless person living on the streets of the District of Columbia at L. v. Adrian Fenty and his individual capacity and Meryl Bowser and her official capacity. Mr. Rickman for the appellants, Ms. Anderson for the accolades. I just want to alert the court I have problems with my voice sometimes so it may go in and out but I will try and speak into the microphone and hopefully this goes smoothly. Mr. Rickman it might help you if you want you can raise the entire podium and given that you're tall it would put the microphone closer to your mouth without you having to stoop. Thank you. I'm going to place the court toward Rickman on behalf of Plaintiff's William Boykin et al. numerous homeless persons living in the District of Columbia. What I want to first draw attention to is the fact that the Senior District Court did not consider that in practice the District's stated policy of shifting or redesign of its homeless services system in practice did not result in any additional spaces within the homeless shelters. I think the uncontroverted evidence is that there was repeated overcrowding, ongoing overcrowding at the remaining shelters within the District of Columbia as attested to by the numerous declarations submitted by plaintiffs in this case to the point where not many were turned away from shelters that were left open in the eastern side of the city. The court stated this pending resolution of inclusive communities and I don't think that inclusive communities necessarily altered the arguments for the conclusion that the actual closing of the shelter, both shelters, Franklin and La Casa shelter taken together, frankly were part of a policy of the District to shift and redesign the shelter. That policy caused a disparate effect on a protected class. It seems that the District Court and the District of Columbia draw a bit of confusion between the causation element and that the causation must result in disparity. Those cases cited by inclusive communities bear out that there is a clear case of causation here within disparity from the District's policy. What was it that the policy caused insofar as the policy is being applied to La Casa and maybe you have two claims but it's a little bit hard to decipher whether your claim is that the policy caused a diminution in services of beds for the client population or whether the policy caused a segregative effect in terms of location of those beds. I take it that you're arguing both but the presentation in the paper seems to conflate those two things and I'd be interested in some clarification whether those are both still lies here. Yes, they're still both. First of all, the cause of the first theory is that the effect was to reduce the number of housing. And the District may argue that under their theory the permanent support of housing by somehow added housing but it's a natural and probable consequence. Indeed, it's an obvious consequence that when you close a shelter you're going to reduce the number of available shelter spaces. Unless and until the PSH comes online and I think on the net, I don't think your record disputes this, on the net there were five fewer beds after the PSH in Columbia Heights came online. Is that still a disproportionate adverse impact? I think that there were more than, and it's difficult to measure that. What the evidence showed was that there were repeated incidents of overcrowding within the remaining shelters. Doesn't every homeless system in the country have overcrowding? There is a difficulty in housing homeless people and especially in an economic downturn and with other services cut. So the fact and the evidence that you've put in of people who are not housed isn't, I don't think you're claiming that that's enough. There were people unhoused before this policy was effectuated, there were people unhoused after. The number may be climbing, but if you are the district and you say, well, we're exercising some policy judgment and trying to replace these beds in trailers with better beds, with more services, you're not claiming that. If the number were the same and if the location is the same, you're not claiming that has an adverse, illegal adverse impact on your clients, are you? I think the fact that the number of homelessness is certainly increasing nationwide and especially in the District of Columbia, I think that that answers the theory that that creates the circumstances where you would have an impact. I think that to argue that because the harm is certainly traceable. Why is that? If the homeless population were static or even falling throughout this period, you think you would have no case? I think the case law says that if there are more housing opportunities, then there's less of a claim for disparate impact. What if there are the same housing opportunities? I don't think there are the same housing opportunities. But what if there were? I understand that. And let's take it step by step. If there were the same housing opportunities, would the fact that the homeless population is rising be enough to support a claim of disproportionate adverse impact? If there were the same housing opportunities within the community, as large as opposed to... If they never closed La Casa, would you still say, whoa, yeah, everything's the same, La Casa's the same, but they haven't... or there's a disproportionate adverse impact because the population is going up? No, I think the policy of closing shelters is the action. That's the problem. Okay. Okay. Now, if they closed La Casa and opened it again in the same trailers, but one of the trailers was irreparably damaged, and so they had one fewer, but they closed it for a week and then reopened it, would you have a case? I'm plausible. I believe so. Why? Because, well, I've looked at Betsy versus Turtle Creek, where they looked at three housing... three building units together. They just centered on the action that was taken that would eliminate housing for a protected class in just one of those buildings. I think where you're going... where you're trying to argue is to say that there was not necessarily an impact, but if the broader policy were to impact a protected class, then one person bringing a lawsuit would certainly be enough to trigger that particular event, as in Griggs versus Duke Power. I wasn't trying to argue. I was really just trying to understand your position. Okay. And so your position is even if there were a five-bed diminution, that's a disproportionate adverse impact. Well, if the broader policy impacted or would have an impact on a protected class... Right. So I'm assuming... But, yes, the act of closing or removing one building or one person could possibly give rise to a claim of disparate impact. That one person would have standing to file a lawsuit alleging disparate impact if it can be shown that the policy as a whole... Unemployment test. Unemployment test has shown where 70 or 80 percent of African Americans fail, but one person brings suit. It's not that the... I mean, I don't think at this stage the standing is contested, that there was concrete harm. And there, you're right, you just need one person to suffer harm. But the test is much more demanding for showing on the merits that there's a disproportionate adverse impact. Demanding in the sense that, well, to show a disproportionate adverse impact I think is pretty strong on the side of plaintiffs in this case. We usually have 87 percent of the homeless population being African American, while only possessing 50 percent of the population at large. Therefore, the impact comes with where African Americans are perhaps two to four times more likely to have to utilize homeless services. Therefore, when you start closing shelters and denying housing in that sense, yes, there is a disproportionate, in a fairly strong case, a disproportionate impact. You're making it hard for me to understand your argument when you say when you start closing shelters, because I don't think you contest that they closed one type of shelter in favor of a different kind of shelter, and that that different kind of shelter was actually built. The permanent supportive housing is a kind of homeless shelter now. Actually, it's a part of their system redesign. Maybe that's where I'm not understanding your argument. I'm actually having trouble understanding your argument. Is it that you don't think permanent supportive housing is a form of homeless shelter? It's not a form of housing for homeless, so that you're seeing this as a much bigger decline in beds, because you wouldn't count any of the PSH beds. I don't see permanent supportive housing as implemented by the district as being nearly adequate to meet its systemized needs. That's a different question. I don't think they're contesting. They agree that the housing is inadequate to serve the homeless population. And I think everyone who works for the district in trying to supply adequate homeless housing would say that. It's not adequate. They would want to provide more. But that really isn't, I don't think, a claim on your part to say, well, it's inadequate. Well, the claim basically as a whole is that the district closed shelters, reduced the available housing, and therefore denied housing to a protected class. The district can come back and say, oh, well, we're doing a system redesign because we want to shift to a permanent supportive housing framework. But their system redesign is either a subterfuge or certainly not working as they intend or plan for it to work. The district's defense is that, oh, well, because we're shifting or reopening this permanent supportive housing and removing chronically homeless, they're somehow adding spaces to the homeless system. And therefore, there's no claim. There's no basic standing. They have no argument to make because they're actually benefiting.  The truth of the matter is, is that there's, you know, while they're closing shelters, the overcrowding at the remaining shelters continues. Persons from the Casa shelter were denied housing at these remaining shelters. They were turned away or left to stand in the streets and certainly not receive any permanent supportive housing. So basically, in reality, no matter what their theory is, in practice, the district policy acted to deny housing. As to whether or not, you know, one of the interesting points about... Mr. Irvin, you're pretty much out of time. Do you want to just finish this point? Well, I would say that the interesting point of inclusive communities was that it made a notation that disparate impact can also be used to uncover those claims of intentional discrimination that may not otherwise have been viable under an intentional discrimination claim. Thank you. Thank you. We'll hear from the other side. Mr. Anderson. A little bit shorter than Mr. Rickman. Good morning, Your Honor. May it please the Court. Stacey Anderson on behalf of the District of Columbia. In addressing the disparate impact claim on disproportionate effect theory, plaintiffs at the prima facie stage needed to show that the district had adopted a policy that had the result of reducing the available housing for homeless persons. They simply failed to carry their burden in this case. But the undisputed evidence in the record shows that while the district closed the La Casa shelter, reducing the number of low barrier shelter bed spaces by 90, during that same period of time, the district increased the permanent supportive housing units by 600. So, in effect, the district increased housing availabilities for the homeless persons during this time. So, there is no district policy the plaintiffs can point to that resulted in a loss of housing to the homeless. Ms. Anderson, when you're referring to the period of time and the diminution by 90 and the adding of 600, are you, is that net for the whole system on both sides of that equation? Or is that the 90 closing La Casa and 600 throughout the whole system? Well, Your Honor, in addition to closing La Casa, we also closed the Franklin School shelter, which had 300 low barrier shelter beds. And I've discussed that in my brief as well. So, if you factor that in, and that was during that same period of time, the 2008 to 2010 period. So, there was a loss of 390 low barrier shelter beds during that period. And then in contrast to that, there was 600 units of permanent supportive housing added during that same period. So, that, we were just looking at that small time frame. And that's system-wide? That's system-wide, yes, Your Honor. There's been no other shelters closed? Not during that period. No other permanent supportive housing added? That's correct, Your Honor. For, and I'm speaking specifically to single men. I'm not speaking to family shelters or, that's kind of a different group. What we look at is the group to which the policy was applied. And here, all the plaintiffs are single, homeless men. So, we focused on that group of persons. So, those. And what's the, I mean, I have read the whole record. I'm familiar with the record. But where, what would you point to as the best site for the 390 to 600? Your Honor, I would say the mayor's report. And I'm sorry, I don't have a page number for that. The mayor's report discusses that. So, yeah, the mayor's report to the council. So, I think at the prima facie stage, plaintiff's case fails for the simple fact that housing was not reduced or housing availability was not reduced for the population at issue. But even if we get past the prima facie stage, the district came forward with a legitimate non-discriminatory explanation for its policy choices in this case, that being the need to reduce chronic homelessness in the district through a program that is designed to take the homeless persons who are most at risk and place them into permanent supportive housing where they have access to greater services to hopefully end that problem. In response to that objective, a plaintiff simply failed to come forward at the third stage of the analysis with showing that there was an alternative to the district's policy that could have been achieved with a less allegedly discriminatory effect. For their intentional racial discrimination claim, they say, their allegation is that D.C. closed shelters in predominantly white areas and that all the shelters in the city suffered from serious deficiencies. So, why is that enough to at least make out a prima facie case? A couple things on that, your honor. First of all, in addition to making that allegation in the complaint, plaintiffs also recognized that the district intended to replace the low barrier shelter at the La Costa site with permanent supportive housing on that site. So, they acknowledged that, in fact, we intended to place the same population back in the same area as they were before. So, that's one factor, I think, that undermines the plausibility of their complaint, their allegation. So, your answer is that, in fact, the district didn't close. It closed a low barrier shelter but replaced it with a... Permanent supportive housing, correct, your honor. In fact, that did occur. So, your point is that this allegation is not supported by the evidence when you look at both... No, no, again, this was dismissed on the complaint. I'm looking at the allegations in the complaint and focusing on the plausibility of their allegation, that race was the reason why the district took the actions it did. No, no, I was only asking you about whether there was a prima facie case here. And your answer was, right, that they replaced the shelter in Northwest Washington with a different kind of shelter in Northwest Washington, right? Correct, your honor. I'm sorry, I misunderstood your question. I thought you were focusing on the district treatment. No, no, I was only talking about the intentional one. But when I asked you your question, you said there were several reasons. Yeah, the second reason, your honor, again, going to the allegation in the complaint. I would acknowledge, as the allegation here, that the district closed the shelter in the predominantly Caucasian part of the district. And then the persons using the shelter were minorities, to an allegation in a Title VII case where an employee says, I'm a minority, I was terminated from my job. Therefore, from that, we're asking the court to infer that race or minority status was the basis of that. So if the complaint had alleged, so we're only talking about the complaint because this intentional discrimination claim was dismissed at the complaint stage. If the complaint had alleged not only that the policy was used, I'm quoting it, as an excuse for closing the shelters in the predominantly white parts of the city, close quote, and that shelters in other parts of the city that were not predominantly white were kept open, if the complaint had said that too, then would you think that the complaint would have been properly dismissed? No, your honor, I would not. I would not. Because again, I think there has to be some facts alleged from which you can draw the inference that race was a motivating factor here. Not simply the fact that an action was taken. Again, I go back to my Title VII example. But that would be two actions. Yeah, that would be two actions. And under a kind of McDonnell-Douglas analog, you say, you know, the unit where all the women worked was the one that was closed down, and the ones where all the men were kept on, or the unit where the minorities worked. Isn't that under McDonnell-Douglas enough to make a crime of friendship case? And so the question is how do we apply that kind of inference, which is a very low pleading barrier, you know, threshold. How do we apply that to the facts here? Again, your honor, I think I'm not sure that I would agree that those allegations alone would be sufficient, even in a Title VII. There's got to be some fact that would, you know, I mean, this is always difficult for me, too, to come up with. You know, I could come up with a million hypotheticals, but I think we go back to this simple Iqbal-Twombly formulation. It's unclear whether, I mean, I haven't found any Title VII cases in this jurisdiction or any fair housing cases in this jurisdiction that apply Iqbal-Twombly over and against a McDonnell-Douglas type of inference and say it's no longer enough. McDonnell-Douglas seems alive and well after Twombly and Iqbal, and I'm just looking for some help on if it's enough in an employment case to say, I was treated unfavorably, people of the majority group were not, and, you know, either the job was left open or it was filled by someone of the majority group. That's enough to raise an inference. Why not these allegations? I'm not sure I agree with that, your honor, that in a Title VII context, that alone, that simply I was a minority. Okay, what more? I think it's something to suggest there was something similarly situated, for example. Other shelters. They say other shelters, low barrier shelters, left open. Right, but, your honor, there's a million reasons why we could have closed those other shelters, a million reasons. But that gets to the burdenship to you. You can come up with good reasons, but they're saying on pleading. I think at the pleading stage, there's got to be something that plausibly suggests that race, of all the millions of reasons why we could have done it, that plausibly suggests that race was the reason. And I think you've got to plead more than simply. I read your brief a little different because I thought in your brief you said, and that's footnote 14 of page 46, for instance, the plaintiffs assert that the complaint alleged that the district offered no explanation or rationale for why the shelters in the predominantly white areas were closed while those in the black areas were left open and that all were of equal size and served an equal number of persons. And then that's quoting the brief. And then you say this allegation does not appear in the complaint. So it sounds like what you were saying in your brief was, actually, if that kind of allegation had been made in the complaint, that would be one thing. But that kind of allegation hasn't been made in the complaint. That's different than what you're saying now is even if that allegation had been made, it wouldn't be enough.  No, I think, Your Honor, I think my point there was just simply to point out that they misrepresent the content of their complaint. I was not intending to suggest that had they actually pled that, that that would have been sufficient. I certainly, that was not my thought process. And I was just simply saying, look, those aren't even in the complaint. Well, that's my question is that seems to me that's your first response in the brief. And I didn't hear that response today. Right. As am I. But are you, do you think that response? No, no, I'm sorry. Again, I took your question as a hypothetical, Your Honor. I didn't know those allegations are not in the complaint. I absolutely agree that those allegations are not in the complaint. Part of the allegations are in, but the other part is not. Right, exactly. Again, they just make the bare bones allegations. Gotcha. So going back to your question, Judge Pillar, again, I think that you've got to, you know, give some suggestions. Excuse me. I thought your answer now, Judge Pillar, is those allegations aren't in the complaint. They aren't. But it goes back to your question of what needs to be there. But didn't you just say to Judge Srinivasan that if they had been, they would have been adequate? No, I did not say that. No, I would not have been adequate. And I apologize if I misspoke. No, I didn't. Okay. All right. So. Okay. Thank you. Thank you, Your Honor. We ask that you affirm. Did you have any other questions? No. Okay. Mr. Rickman, you're out of time, but you can have one minute. Thank you, Your Honor. To address the disparate treatment claim, I think that the fact that the homeless population is 87 percent African American certainly spells out that race was a motivating factor. And the fact that they chose to put the permanent supportive housing in predominantly white areas as opposed to predominantly African American areas doesn't assist their case in defeating the clear inference under McDonnell Douglas. The allegation was raised that the shelters were similarly situated as far as condition and other factors as to create the inference under McDonnell Douglas. Also, the district pointed to the mayor's report on permanent supportive housing. And I think that the brief spells out, as well as if you look at the report, where most of the placements, over 90 of the placements in permanent supportive housing were made in predominantly African American wards, none of the placements were made, or very few, 10 percent or less, were made in transitioning white wards. But isn't it true that on the La Casa site, they created more beds than they closed? No. No? No less. Almost as many. No. Almost as many? Not even close. I thought it was within... Half. Within a handful. No, units half. Beds, the units are bigger. 45 units. And in fact, La Casa... I think they say 85 beds, if I'm not mistaken. No, it's 45 beds. And in fact, La Casa is limited to veterans and not the broader homeless population. So that needs to be clarified as well. All right. Thank you. Case is submitted.
judges: Tatel, Srinivasan, Pillard